IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PABLO E. LINN,                              )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )        CIVIL ACTION 07-0377-WS-M
                                            )
ST MOBILE AEROSPACE                         )
ENGINEERING, INC.,                          )
                                            )
        Defendants.                         )

ORDER

        This matter comes before the Court on defendant's Motion for Summary Judgment (doc.

35).  The Motion has been briefed and is ripe for disposition at this time.

I.      Background.

        This case arises from a half-day stint of employment for plaintiff, Pablo E. Linn, for

defendant, ST Mobile Aerospace Engineering, Inc. ("MAE"), in Mobile, Alabama in May 2006.

        Linn is a 61-year old Hispanic male from Mexico who became a naturalized U.S. citizen

in 1997 and who has resided in Mobile with his wife and adult children since 2004.  (Linn Dep.,

at 8-11.)[1]  Linn has extensive work experience in the aircraft industry as an interior mechanic,

_____

        [1]      The Court's review of the record has been impeded by plaintiff's submission of
voluminous record materials that are not cited in his brief, including specifically the complete
transcripts of the depositions of Linn and Curtis Robert Bryant.  The Linn submission is
especially perplexing, inasmuch as plaintiff submits his entire 257-page transcript, then cites
almost exclusively to an EEOC declaration (rather than the deposition transcript) in his
Statement of Facts.  In addition to running afoul of Local Rule 5.5(c)'s requirement that only
relevant excerpts of discovery materials be submitted, this practice is not a permissible means of
shifting the parties' burdens to the Court.  "There is no burden upon the district court to distill
every potential argument that could be made based upon the materials before it on summary
judgment."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Thus,
this Court will not scour uncited portions of the parties' evidentiary submissions for any scrap of
evidence that may advance their positions.  *See Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061,
1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of
evidentiary material into the record, shift to the Court the burden of identifying evidence
supporting their respective positions.");  *Witbeck v. Embry Riddle Aeronautical University, Inc.*,
219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of

working on aircraft areas such as floorboards, door panels, closets, and galleys.  (*Id.* at 31-33.)
Between 2000 and 2007, Linn worked approximately two dozen contract jobs as an aircraft
interior mechanic, usually lasting at least a few months each, through approximately six
contracting companies.  (*Id.* at 41-51 & Exh. 6A.)  Linn's work history included multiple periods
of employment at MAE, including for example assignments from December 2003 through May
2004, August 2004 through February 2005, and March 2005 through September 2005.  (*Id.*)[2]
MAE's workforce includes a substantial percentage of Hispanics; indeed, during the 18-month
period from April 2006 through October 2007, some 59% of the 92 contract interior mechanics
employed at MAE were Hispanic.  (Wellington Decl., ¶ 3.)

The events giving rise to this lawsuit began in late April 2006, when Linn was employed
by a company called Pemco in Dothan, Alabama, working on seats on 727 passenger aircraft.
(*Id.* at 149.)  Because his family was in Mobile, Linn preferred to work in Mobile, even at
reduced pay.  (*Id.* at 116.)  In April 2006, Linn received a series of telephone calls from a person
named Valdir Damota, wherein the latter offered him employment at MAE in Mobile.  (*Id.* at
156-57.)[3]  MAE is a maintenance repair organization that performs heavy maintenance on
aircraft for air carriers and air cargo operations, including both passenger and cargo aircraft.
(Bryant Dep., at 6-7.)  MAE's largest customer is FedEx, which accounts for about 60% of the

---

evidence is an obvious corollary to the requirement that parties specifically identify the portions
of the case file which support their assertions regarding whether genuine issues remain for
trial.").  Instead, review of the parties' submissions is restricted to the portions of the record they
have cited, and the legal arguments they have expressly articulated.

[2]     Defendant maintains that Linn worked at MAE on six separate occasions from
February 2002 through September 2005; however, Linn's deposition testimony supports only
four such occasions, although there is some equivocation thereafter.  (Linn Dep., at 47-49, 82.)
The discrepancy is not material.  Either way it is clear that Linn had worked repeatedly for MAE
for months at a time without incident during the several years preceding the events that
culminated in this lawsuit.

[3]     In the light most favorable to plaintiff, the record reflects that Damota
precipitated these discussions.  Linn testified that he was not looking for another job, particularly
one with MAE in Mobile, because he was earning more money with Pemco in Dothan, and that
he had no intention of resigning from Pemco until Damota convinced him otherwise.  (*Id.* at
161.)

work at that facility.  (*Id.* at 8-9.)  Damota, a contract coordinator for a company called AeroJet, worked on-site at MAE to provide skilled mechanics to MAE on a contract basis.  (Linn Dep., at 112; Damota Decl., ¶ 2.)[4]  Linn initially turned down Damota's offer, but Damota persisted, emphasizing that the MAE job would enable Linn to be close to his family and save money on hotels.  (Linn Dep., at 156.)  Finally, Linn relented, but not without a condition.  As Linn recounts the conversation, "I don't want to work FedEx I tell him.  And then he says, no, you not going to work for FedEx.  You're going to work for – for something else, but not FedEx, you know."  (*Id.* at 157.)[5]  According to Linn, Damota specifically "promised" him that he would not have to work on FedEx cargo planes if he accepted the MAE job, but that he instead would be

---

[4]        Linn understood that Damota was working for AeroJet as contract coordinator. (Linn Dep., at 117, 161.)  In fact, Linn's testimony was that he had been carrying Damota's business card with him since 2003 or 2004.  (*Id.* at 121-23.)  That business card identified Damota as a "Coordinator" for AeroJet Support, Inc., with an email address at aerojetsupport.com.  (*Id.* at Exh. 20.)  That said, each and every time Linn went to work for MAE, it was through a contracting agency like Damota's, and all of Linn's work for MAE was performed on MAE projects in MAE hangars on MAE property under the supervision and control of MAE supervisors, and subject to the evaluations and approval of MAE.  (*Id.* at 247-50.)  Based on these facts, any suggestion that Linn was not an MAE employee for Title VII purposes does not merit serious consideration in the context of this Rule 56 motion.  Besides, even after belaboring facts concerning Linn's employment relationship with AeroJet and insinuating that Linn was not an MAE employee, defendant admits in its principal brief that this argument is a non-issue, at least for summary judgment purposes.  (Defendant's Brief, at 17.)

[5]        The kinds of jobs that interior mechanics perform are basically the same for both passenger aircraft and cargo aircraft; however, Linn prefers to work on passenger planes because "in the cargo planes you have to be on your knees. ... And for me it's painful, you know, because I'm getting too old, and that's why I don't like to work on that plane."  (Linn Dep., at 36-37.)  In his first assignment with MAE back in 2002, Linn had worked on FedEx cargo airplanes; however, he had not done so thereafter.  As Linn explained, "since then I don't like it, you know. And that's what I don't want to work in that kind of plane. ... It's too – too hard job, you know, for me."  (*Id.* at 134-35.)  Linn's aversion to working on cargo aircraft held equally true with respect to FedEx planes because, as he put it, "if I going to work in FedEx, I'm going to be painful for me for my knees, you know. ... And I tell them, you know, I don't want to work for FexEx.  Simple as that."  (*Id.* at 159-60.)  MAE disputes Linn's assertion that interior work on cargo aircraft is tougher on the knees than interior work on passenger aircraft.  (Mixon Decl., ¶ 7.)  Of course, the summary judgment record is taken in the light most favorable to the nonmovant, so MAE's evidence on this point will not be credited.

assigned to other aircraft.  (*Id.* at 157, 159, 160, 186.)[6]  When asked whether he believed Damota had authority to strike such a bargain with him, Linn testified, "I guess, yes. ... I believing in him where I going to work in some kind of plane is where I going to work, you know. ... I think he already discuss with the other people, the people at MAE, you know, for me to go there."  (*Id.* at 163-64.)[7]   Linn's testimony was clear that he relied on Damota's promise, stating "that's the reason I left my job over there to come because of that promise."  (*Id.* at 169.)[8]  For its part, MAE presents evidence that Damota was not authorized to make any such promises to Linn about what job assignments he would or would not be given at MAE.  (Bryant Dep., at 65; Ng Decl., ¶¶ 7-9; Mixon Decl., ¶ 7; Langley Decl., ¶ 6; Damota Decl., ¶¶ 4, 8.)

MAE's decision to approve Linn's hire was made by its Avionics Manager, Phillip Mixon, who presumed that Linn was Hispanic based on his name.  (Mixon Decl., ¶ 4.)  After attending orientation and training sessions at MAE on May 1 and 3, Linn reported to MAE for his first day of work on May 8, 2006.  (*Id.* at 175-79, 181.)  Sometime before that date, Damota had provided Linn with a work assignment pass reflecting his assignment to first shift on an Air Canada project in Hangar 2, under the supervision of a lead employee named John Shaw.  (*Id.* at

---

[6]     Defendant challenges plaintiff's account of the facts via a declaration from Damota denying that he ever extended such a promise to Linn.  (Damota Decl., ¶ 4.)  But the Court must credit the record in the light most favorable to plaintiff on summary judgment, so defendant's submission of a declaration contesting Linn's version serves only to underscore the factual dispute.  Stated differently, defendant cannot prevail on summary judgment simply by branding Linn a liar.  Nor is defendant's Rule 56 case strengthened by submitting repetitive averments from the same witness that merely reiterate the same denials of the same disputed facts over and over again.  (*Id.*, ¶¶ 4, 5, 8.)

[7]     When defense counsel asked him a second time whether he believed Damota had such authority, Linn answered, "I believe so, you know, because he give the job to you" and elaborated "he would have authority, like I say, you know, because he hire me."  (*Id.* at 167-68.) Linn answered similarly when the same question was posed a third time.  (*Id.* at 169.)

[8]     To accept this position at MAE, Linn quit his job at Pemco in Dothan, without providing proper notice, rendering him "in bad shape" for Pemco.  (Linn Dep., at 73-76.) According to Linn, Pemco paperwork confirms that he was ineligible for rehire because he had failed to work out a prescribed notice period before leaving the job on April 24, 2006, to work at MAE.  (*Id.* at 154-55.)

187-88; Plaintiff's Exh. 2.)[9]  When Linn arrived at MAE on May 8, Damota arranged for his entry into the facility and instructed Linn where to report for duty.  (Linn Dep., at 194.)  At Damota's instruction, Linn proceeded to Hangar 2 to report to Shaw.  (*Id.*)  After being welcomed by Shaw, Linn encountered MAE Interiors Supervisor Gary Langley later that morning.  In particular, Langley stopped Linn as he was walking through the hangar and asked where he was going.  (*Id.* at 196.)  Linn responded that he had just reported to Shaw for work, in response to which Langley stated, "you're not going to work for him, you know.  You're going to work for FedEx."  (*Id.*)  Linn protested that his work assignment pass said he was assigned to Shaw's team and that Damota had told him he would not have to work on FedEx aircraft, but Langley replied, "he's not the boss.  I'm the boss."  (*Id.*; Langley Decl., ¶ 5.)  Linn stated that he was not going to work for FedEx, after which Langley "got kind of mad," raised his voice, and instructed Linn to follow him to talk to Mixon.  (Linn Dep., at 197-99.)[10]

When they reached Mixon's office, Langley told Mixon "this is Pablo Linn," and explained the situation as the three of them stood outside Mixon's door.  (*Id.* at 200-201.)[11]

---

[9]        Prior to May 8, when Linn had been at MAE for training or orientation, Linn had encountered Shaw (whom he knew from previous assignments at MAE) and mentioned to him that he (Linn) would be coming back to work for Shaw in a couple of days.  (*Id.* at 192-93.)  Shaw advised supervisor Gary Langley of this fact shortly thereafter, and the two of them agreed that Shaw did not need additional interior mechanics on his Air Canada crew.  (Shaw Decl., ¶ 5.)  Yet MAE did not apprise Linn of that determination until his arrival on-site on May 8.

[10]       MAE concedes that Linn explained to Langley that the reason he would not do FedEx work because the work "made his knees hurt."  (Langley Decl., ¶ 5.)

[11]       In summary judgment briefing, plaintiff relies on his declaration accompanying his EEOC Charge for the proposition that Mixon asked Linn "what's your name?" and dismissed him with a wave of his hand after Linn identified himself in his typical Spanish accent.  (Doc. 37, at 14.)  But Linn testified repeatedly and unambiguously in his deposition that the sequence of events was that when they arrived at Mixon's office, Langley told Mixon, "this is Pablo Linn."  On summary judgment, plaintiff does not get to pick and choose from among discrepancies in different iterations of his own testimony to stitch together the version of events most advantageous to him.  Nor can he trump his own repeated statements in his deposition by reference to a lawyer-prepared declaration signed in connection with his EEOC filing.  *See generally Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the

Mixon was "kind of rude" to Linn, telling him "not to be there ... in this office because that office was for people like" Langley.  (*Id.* at 202.)  Specifically, Mixon waved his hand and said "this place is for us only" or for "people like us."  (*Id.* at 203-04.)[12]  Langley and Mixon disappeared inside the office for a few minutes, leaving Linn standing outside, until Langley emerged and instructed Linn to wait in Damota's office while Langley determined whether he could find him an alternate assignment.  (*Id.* at 202-03.)  Linn proceeded to Damota's office, but had to wait outside there as well, because Damota was busy with other matters.  (*Id.* at 205.)  Linn waited for more than an hour.  (*Id.*)  Finally, Damota summoned him and said, "I have a bad news for you.  I said, what happened.  He said, well, you fired."  (*Id.* at 206.)  Linn's understandable reaction was that he "got mad"; however, he turned in his badge to Damota and Damota wished him luck, after which Linn left the premises.  (*Id.*)[13]  Linn categorically denies any further communications with Langley or another MAE manager named Curtis Bryant after that time.  (*Id.* at 207, 209-11.)[14]

---

nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.").

[12]     Once again, defendant submits evidence disputing Linn's account of this incident, impugning Linn's veracity, and denying that Mixon ever made such a comment.  (Mixon Decl., ¶ 10; Langley Decl., ¶ 7.)  Of course, this protestation is utterly inconsequential for summary judgment purposes because the record must be viewed in the light most favorable to the nonmovant.  Submitting record evidence that defendant well knows to be disputed by plaintiff's evidence needlessly muddies the waters.

[13]     Defendant offers substantial evidence and argument concerning Linn's favorable employment and earnings history with other companies after being dismissed by MAE.  That evidence may have significance for purposes of calculating damages; however, it is irrelevant to the liability questions to which the Rule 56 motion is directed and therefore will not be considered by the Court at this time.

[14]     Notwithstanding Linn's testimony, and notwithstanding the fact that the summary judgment record must be viewed in the light most favorable to the nonmovant, MAE proffers evidence and argument that Linn was summoned back to the hangar to speak with Langley and Bryant about an alternative assignment, at which time Linn unleashed an expletive-filled tirade against Langley, wherein Linn used the "f word" repeatedly and accused Langley of being out to get him.  (*See* Defendant's Brief (doc. 34), at 14-15, and record citations therein.)  Obviously, that evidence cannot and will not be considered on summary judgment, inasmuch as Linn unequivocally denies that such incident ever occurred and contends that he "never talk[s] like

From MAE's perspective, the problem was that there was no work for Linn on Shaw's crew because the Air Canada project was near completion and already had enough manpower assigned to it. (Bryant Dep., at 18-19.) Nonetheless, Mixon had authorized the adding of "headcount" to that project. (*Id.* at 19.) In recognition of that fact, MAE's Program Manager, Curtis Bryant, was prepared to reassign Linn to a Northwest aircraft project that did not need additional manpower either, and "just absorb that cost." (*Id.* at 22.) Bryant was willing to provide this assignment to Linn despite Bryant's awareness that Linn had refused Langley's instruction to work on a FedEx project. (*Id.* at 21-22, 27.) For reasons that are in dispute on summary judgment, that reassignment never happened. Defendant's unchallenged evidence is that it was Bryant's decision to fire Linn. (Mixon Decl., ¶ 10; Plaintiff's Exh. 6, at #6.) Bryant testified that this decision was predicated exclusively on "what [Linn] said and his professionalism" in an alleged profane tirade directed at Langley, that Linn's "use [of] profanity on the floor ... was the determining factor," and that the use of "profanity of any kind ... [is] why he was released." (Bryant Dep., at 26-27, 57, 66.) Of course, whether the tirade that MAE identifies as the "determining factor" in its decision to fire Linn ever occurred is itself a disputed question of fact.[15]

Linn had worked on John Shaw's crew previously while employed by MAE, and had never had problems or complaints with Shaw, Gary Langley, Phil Mixon or anyone else in that regard. (Linn Dep., at 87-92. 144-46.) Aside from the incident of May 2006, Linn has no complaints or dissatisfactions with how he was treated by any manager, supervisor or lead at MAE at any time. (*Id.* at 92-93, 112.) Again, excluding May 2006, Linn acknowledges that he was always treated fairly while at MAE. (*Id.* at 92-93.) However, Linn believes that MAE treated other Hispanic employees poorly, including firing a person named Jesus Nunez and

that." (Linn Dep., at 210.)

[15]    Also of potential significance is the fact that Mixon, the MAE manager who made the decision to hire Linn despite knowledge of his Hispanic background, was not the decisionmaker who fired Linn on his first day on the job.

another person named Jose.  (*Id.* at 217-19.)[16]  Linn also ascribes discriminatory animus to

Bryant's deposition testimony that Bryant "assumed" that Linn's alleged complaints on May 8

that Langley was out to get him were based on Linn's ethnicity, even though Linn said nothing

to that effect at that time.  (Bryant Dep., at 25-26, 39-40.)[17]

## II.   Procedural Posture.

On May 23, 2007, Linn initiated this action by filing a Complaint (doc. 1) against MAE

in this District Court.  The Complaint alleges a federal claim of race and national origin

discrimination, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*,

on the theory that MAE terminated Linn's employment because of his Hispanic race and/or

Mexican national origin.[18]  Linn also asserts state-law claims against MAE for breach of contract

---

[16]      In that regard, plaintiff submits a copy of Nunez's EEOC Charge of
Discrimination filed against MAE in February 2007.  (Plaintiff's Exh. 5.)  That Charge alleges
that Shaw made Nunez and other Hispanic employees uncomfortable by telling them to hurry up
and saying "andale, andale" even when the project was on schedule.  The Charge further alleges
that when the crew of six Hispanics and one African-American mechanic complained about
Shaw to MAE human resources in April 2006, they were all fired on the same day, but the
African-American was later rehired.  Evidently, the Nunez EEOC Charge and those of the other
Hispanic employees involved were dismissed by the EEOC on June 30, 2008 for want of
reasonable cause to believe that a violation had occurred.  (Doc. 44.)

[17]      Linn also would find discriminatory animus in Bryant's justification of this
assumption as being that "it's not uncommon" for complaints of ethnic discrimination to be
made, that Bryant had similar experiences when he worked for Delta Airlines, that "[m]ost of
[his] cleaners there were Hispanic," and that "if ... you're working them too hard or whatever,
I've heard it come up before that it was because of their ethnic background."  (*Id.* at 42.)  Bryant
also mentioned the Nunez incident, which he framed as follows: four Hispanic and one African-
American interior mechanics complained about their assignments at MAE and accused Shaw of
picking on them.  Ultimately, those employees all called in sick on the same day to protest
Shaw's conduct, resulting in all of them being discharged; however, the African-American
employee's termination was rescinded because he established a legitimate reason for missing
work, while the Hispanic employees did not.  (*Id.* at 44-46, 50.)

[18]      Count One of the Complaint is framed exclusively in terms of Title VII, and does
not identify any claim under 42 U.S.C. § 1981.  (Doc. 1, ¶¶ 33-36.)  However, the Complaint
references § 1981 elsewhere, and the parties' summary judgment submissions reflect agreement
that a § 1981 claim has been joined herein.  (*See* doc. 34, at 2, 17-18.)  Accordingly, the
undersigned will consider Linn's discrimination claims under both Title VII and § 1981 to be
joined in these proceedings, pursuant to Rule 15(b)(2), Fed.R.Civ.P., which allows unpleaded

and promissory fraud, predicated on his allegation that MAE (by and through Damota) represented and promised him that he would not have to work on FedEx aircraft to entice him to return to MAE, then pulled the proverbial rug out from under his feet by reassigning him to a FedEx project on his very first day on the job.  After the close of discovery, MAE moved for summary judgment as to all of these causes of action.

## III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

---

issues to be tried by express or implied consent.  That said, the inclusion of a § 1981 cause of action to complement the Title VII claim does not alter the Court's analysis here in any material respect, inasmuch as "[b]oth of these statutes have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Cooper v. Southern Co.*, 390 F.3d 695, 724 n.16 (11th Cir. 2004) ("The *McDonnell Douglas* framework for establishing a *prima facie* case is used in intentional discrimination cases brought under either Title VII or Section 1981."); *Sanders v. City of Montgomery*, 319 F. Supp.2d 1296, 1311 (M.D. Ala. 2004) ("The legal analysis of claims of race discrimination pursuant to either Section 1981 and Title VII is the same.").

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

IV. **Analysis.**

    A.     *Title VII / Section 1981 Cause of Action.*

        1.     *The* McDonnell Douglas *Framework.*

The parties' respective summary judgment arguments on Linn's discrimination claims will be assessed in accordance with the time-honored *McDonnell Douglas* framework. Absent direct evidence of discrimination (which has neither been alleged nor shown here), Linn must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race or national origin discrimination.[19] If he does so, that showing "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005). At that point, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]. ... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997) (citations omitted). A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). The ultimate burden of persuasion remains with the plaintiff. *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002). Thus, "[i]f the

---

    [19]     Linn's burden of establishing a *prima facie* case is not heavy. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*).

          2.      *Plaintiff's Ability to Establish a* Prima Facie *Case.*

        Linn contends that his discharge by MAE on May 8, 2006 constituted unlawful race and national origin discrimination, in violation of Title VII & § 1981.  To establish a *prima facie* case, Linn must show that "(1) []he belongs to a protected class; (2) []he was qualified to do the job; (3) []he was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside [his] class more favorably."  *Crawford v. Carroll*, --- F.3d ----, 2008 WL 2246677, *6 (11th Cir. June 3, 2008).  Importantly, "[a] plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably.  *McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class."  *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005).  "Only after the plaintiff has made his *prima facie* case does the burden shift to the defendant."  *Id.*

        In its summary judgment filings, MAE does not challenge, and cannot reasonably challenge, Linn's ability to show that he belongs to a protected class (he is Hispanic and of Mexican national origin), that he was qualified to do the job (he obviously was, given his many years of experience as an interior mechanic and his successful completion of past assignments for MAE), or that he was subjected to an adverse employment action (MAE fired him in his first day at work).  Therefore, the sole battleground for purposes of this Rule 56 Motion is whether plaintiff can satisfy the fourth element of a *prima facie* case of race or national origin discrimination.  Linn does not purport to identify any similarly situated non-Hispanic, non-Mexican employees that he contends MAE treated more favorably, nor does he contend that a non-Hispanic, non-Mexican individual replaced him.  While these omissions may be sufficient in and of themselves to doom his discrimination claims, both Linn and MAE correctly recognize that "[t]he methods of presenting a *prima facie* case are not fixed; they are flexible and depend to a large degree upon the employment situation."  *Wilson*, 376 F.3d at 1087; *see also Gillis v.*

*Georgia Dep't of Corrections*, 400 F.3d 883, 887 (11th Cir. 2005) (noting that "the *McDonnell Douglas* framework is to be liberally construed"). MAE concedes that Linn may satisfy his *prima facie* burden on this fourth element without evidence that similarly situated persons outside the protected class were treated differently, so long as he produces "other circumstantial evidence to show that MAE engaged in intentional national origin or race discrimination." (Defendant's Brief (doc. 35), at 20 n.10.) Linn concurs that this is the appropriate test. (Plaintiff's Brief (doc. 37), at 12-13.) Given the parties' solidarity on this point, the Court looks to see whether Linn has presented sufficient "other circumstantial evidence" to meet his *prima facie* burden of showing that MAE fired him because he is Hispanic.[20]

      Linn identifies the following evidence that he contends satisfies his *prima facie* burden of showing that he suffered disparate treatment because of his national origin or race: (1) Damota's persistent recruiting efforts and promises that he would not be required to work on FedEx aircraft if he accepted the MAE job; (2) Langley's "brusque" greeting, "Hey Pablo, where are you going?" and his refusal to accept Linn's statement that he had been assigned non-FedEx work; (3) Mixon's act of sweeping his hand toward Linn and telling him to leave his office because "this place is for people like us"; (4) the "general disrespectful manner in which management at MAE spoke to" Linn; (5) MAE's history of discrimination against Hispanics; (6) Bryant's assumption that Linn's unhappiness on May 8 was rooted in a complaint of discrimination; and (7) Bryant's failure to investigate Langley after Linn complained on May 8 that Langley was out to get him. (Plaintiff's Brief (doc. 37), at 13-17.)

---

[20]     In addition to both parties agreeing to its propriety here, this "other circumstantial evidence" framing of the fourth *prima facie* element finds support in Circuit precedent. *See, e.g., Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1325 (11th Cir. 2006) (indicating that plaintiff failed to establish *prima facie* case under Title VII where "she failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination"); *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002) (stating fourth element of Title VII *prima facie* test as being that plaintiff was "replaced by a person outside the protected class **or suffered from disparate treatment because of membership in the protected class**") (emphasis added); *Embry v. Callahan Eye Foundation Hospital*, 2005 WL 2009046, *8 n.12 (11th Cir. Aug. 23, 2005) ("Even in the absence of evidence showing that a 'similarly situated,' employee outside of the plaintiff's protected status has been treated differently, a plaintiff still may be able to establish, by circumstantial evidence, a *prima facie* case of discriminatory animus."); *Cooley v. Great Southern Wood Preserving*, 2005 WL 1163608, *7 (11th Cir. May 18, 2005) (similar).

None of this evidence, considered separately or in the aggregate, is sufficient to meet Linn's obligation to show circumstantial evidence of anti-Hispanic or anti-Mexican sentiment at MAE. First, there is no evidence that Damota (who is himself Hispanic) recruited Linn on MAE's behalf any differently than he recruited interior mechanics outside Linn's protected class. Second, there is no evidence that Langley was any less "brusque" to non-Hispanic contract employees or any more flexible with their assignments than he was in his dealings with Linn on May 8, 2006. Third, Mixon's directive that Linn leave his office while MAE managers discussed his situation and his statement that "this place is for people like us" raise not a whiff of an inference of discriminatory animus.[21] Fourth, Linn's vague and conclusory accusation that management spoke to him in a "general disrespectful manner" is without record basis and is inadequate as a matter of law to create a jury question.[22] Fifth, Linn's assertion that MAE

_____

[21]      This point is hotly debated in the parties' briefs. Plaintiff hypothesizes that the "like us" comment referred to people of non-Hispanic status, while defendant construes it as meaning managers or supervisors. Taken in context, nothing about the "like us" comment suggests it was racially motivated. There is no evidence that contract mechanics of any race or ethnic background were allowed into MAE managers' offices while managers and supervisors decided their assignments. Plaintiff concedes as much, effectively backing himself into a corner by relying on a theory that contradicts his own deposition testimony. Indeed, plaintiff maintains that "[d]efendant's argument that Mr. Mixon meant managers or supervisors by 'us' *would hold water* were it not for Mr. Mixon's asking Mr. Linn's name ... and hearing his Spanish name spoken in Spanish-accented English." (Plaintiff's Brief (doc. 37), at 14-15 (emphasis added).) As discussed *supra*, however, Linn's unequivocal, repeated deposition testimony was that Langley told Mixon, "this is Pablo Linn," not that Linn identified himself to Mixon. Therefore, plaintiff's sworn testimony in this case fatally undermines the factual scenario on which his counsel relies in trying to wring some trace of anti-Hispanic animus out of a facially innocuous statement by Mixon that "this place is for people like us" as he shooed the only non-manager out of his office so the managers could decide Linn's fate in private. Besides, the uncontroverted evidence is that Mixon knew Linn's name and presumed that he was Hispanic at the time when Mixon approved the hiring of Linn as a contract mechanic in April 2006, a course of conduct running directly counter to the discriminatory animus plaintiff would now ascribe to Mixon.

[22]      *See, e.g., Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.") (citation omitted). Notwithstanding this general allegation, Linn's testimony is clear that the only managerial statements to him with which he took issue were Langley's "where are you going" inquiry and Mixon's "this place is for people like us" comment. Such comments cannot reasonably be viewed as exhibiting disrespect towards Linn, much less being

-13-

discriminates against other Hispanics is admittedly based on hearsay "when they gossip or whatever, you know." (Linn Dep., at 214.) Such testimony does not tend to show disparate treatment of Linn.[23] Sixth, plaintiff makes much of Bryant's statement in his deposition that he "assumed" Linn's profane outburst toward Langley (which Linn insists never happened) amounted to a complaint of unfair treatment based on his race or ethnic background. Plaintiff extrapolates from this testimony that Bryant's "(biased) intuition told him that Hispanics were trouble-makers." (Plaintiff's Brief (doc. 37), at 17.) While the wording of certain of his deposition answers may have been inartful, Bryant's testimony is simply too attenuated to

_____

infused with racial or ethnic hostility.

[23]     To the extent that Linn predicates this argument on the experiences of Jesus Nunez in the "sick-out" of April 2006, the evidence before the Court does not support an inference of discriminatory animus. The Court understands that Nunez and his colleagues complained to MAE that Shaw was "picking on them," and that Nunez, several other Hispanic employees, and one African-American employee proceeded to call in sick *en masse* to protest Shaw's conduct. (Bryant Dep., at 45-47.) All of these employees were fired by Bryant and MAE "[b]ecause they called in sick as they left the gate," but the African-American employee was reinstated after showing a legitimate reason for not being at work, to-wit a court order requiring him to attend a class. (*Id.* at 45-51.) Linn contends that this incident demonstrates a pattern of unfair treatment of Hispanic employees by MAE. It does no such thing. By all appearances, MAE had a valid nondiscriminatory reason for its treatment of Nunez and the other Hispanic mechanics, and contrary to plaintiff's accusation there was nothing "questionable" (from a Title VII standpoint) about its decision to discharge employees for orchestrating a collective "sick-out" and walking off the job. Moreover, it is significant that Nunez complained that Shaw was the principal discriminatory agent; by contrast, Linn testified that he had never had any complaints about Shaw, but that he had heard that Shaw discriminated against black people (not Hispanics). (Linn Dep., at 87-91.) Whether or not Shaw harbored discriminatory animus against Nunez is of vanishingly low probative value as to whether Langley discriminated against Linn. More generally, this is the case of Pablo Linn, not that of Jesus Nunez. Their circumstances differ considerably, in terms of the type of conduct they complain about, the alleged agent of discrimination, and the like. While MAE's treatment of Nunez may be relevant to Linn's claims of discrimination pursuant to *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008) (confirming admissibility of "me too" evidence of discrimination by same supervisor to show motive, intent or plan to discriminate against the plaintiff), this Court will not allow Linn's Rule 56 motion to devolve into a *de facto* mini-trial as to whether Nunez was discriminated against, particularly where Nunez is not similarly situated to Linn in multiple material respects, such that the issue of Nunez's treatment by MAE is collateral to Linn's claims of race and national origin discrimination.

support an inference that he harbors a discriminatory attitude towards Hispanics, much less that such a discriminatory attitude prompted him to fire Linn.[24]  Seventh, as for Linn's accusation that Bryant should have investigated Langley, plaintiff ascribes discriminatory animus to Bryant for not investigating Langley based on a confrontation that Linn denies ever occurred.  Rule 56 does not confer upon Linn the right to engage in opportunistic manipulation of the summary judgment process by denying in one breath having ever had a verbal confrontation with Langley in Bryant's presence, then in the next breath branding Bryant a racist for failing to investigate Langley based on said confrontation.  *See generally Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.  Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.").

In short, Linn's meager showing is inadequate to meet his burden of coming forward with circumstantial evidence of disparate treatment arising from his membership in a protected class, as required to satisfy the fourth element of a *prima facie* case of discrimination under Title VII or § 1981.  "Because [Linn] failed to present a *prima facie* case of discrimination, this court need not examine [MAE]'s articulated reasons for discharging him, nor determine whether these reasons were merely a pretext for discrimination."  *Hawkins v. Ceco Corp.*, 883 F.2d 977, 985 (11th Cir. 1989).  The Motion for Summary Judgment will therefore be **granted** as to Linn's Title VII / § 1981 cause of action.

> ### B.      State-Law Causes of Action.

Turning now to Linn's state-law claims against MAE for breach of contract and

---

[24]      In so concluding, the Court does not endorse MAE's kneejerk reaction that Bryant's "assumption" is inadmissible under Rule 602, Fed.R.Evid.  (Doc. 39, at 8.)  This argument is disingenuous, inasmuch as Bryant's testimony on this point would obviously be admissible to show his state of mind, motive and the like, as to which Bryant obviously did possess the requisite personal knowledge.  Instead, the Court's conclusion is premised on a close reading of Bryant's deposition testimony in context, which does not reveal any statements from which a reasonable jury could conclude that Bryant harbored invidious prejudices against Hispanic employees at MAE, much less that he had a history of "problems with other Hispanic workers" or "prior questionable handling of incidents with Hispanic workers," as plaintiff alleges on pages 16 and 17 of his brief.

promissory fraud, both causes of action are predicated on Damota's promises that he would not be required to work on FedEx aircraft at MAE.  According to plaintiff, he relied on these representations from Damota in resigning his other job and accepting employment at MAE, only to have MAE fail and refuse to honor that arrangement by assigning him to a FedEx project immediately upon his arrival at MAE.

       1.      *Whether Exercise of Supplemental Jurisdiction is Appropriate.*

The dismissal of the Title VII / § 1981 claim creates an interesting jurisdictional wrinkle, inasmuch as it was the only federal cause of action asserted.  The remaining claims are exclusively state-law claims as to which original federal jurisdiction is lacking, and there is no diversity of citizenship.[25]  The only jurisdictional basis for the breach of contract and fraud claims is supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a).  By statute, a district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction."  § 1367(c)(3).  In that scenario, the decision of whether to exercise supplemental jurisdiction over the state-law claims rests in the Court's discretion.  *See generally Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1185 (11th Cir. 2003) (in exercising § 1367(c) discretion, court should consider principles of economy, convenience, fairness, and comity); *Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1569 (11th Cir. 1994) (similar).  After careful consideration of the *Shotz* factors, the undersigned is of the opinion that the continued exercise of § 1367 jurisdiction over Linn's state-law claims is appropriate in the specific context of this case, notwithstanding the entry of summary judgment to MAE on Linn's federal causes of action, because (a) these state-law issues have been extensively litigated and briefed in this forum, (b) the agency questions implicated by the Alabama state-law claims are straightforward and well-settled, (c) the parties would incur needless expense and delay in

---

[25]     The parties have not flagged this jurisdictional issue.  Nonetheless, this Court bears an affirmative duty to inquire *sua sponte* whenever it appears that subject matter jurisdiction may be lacking.  *See Fitzgerald v. Seaboard System R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985) ("A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."); *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) ("[A] court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises.").

litigating this matter if the state-law claims were dismissed to be refiled in state court, and (d) plaintiff's state-law claim for fraud may be time-barred by operation of Ala. Code § 6-2-38(*l*) if he were to attempt to refile it in state court.[26]  On that basis, the Court will exercise supplemental jurisdiction over the state-law causes of action, notwithstanding the pre-trial dismissal of all federal claims in this non-diversity action.

>    2.    *Damota and the Apparent Authority Doctrine.*

Sweeping aside the parties' rhetoric and their plainly meritless sub-arguments (such as MAE's suggestion that plaintiff's evidence fails to show that Damota extended a contract offer to Linn, or that MAE could not have intended to deceive Linn by "baiting-and-switching" him to agree to work in one area when MAE intended all along to assign him another job he never would have accepted otherwise), defendant's Motion for Summary Judgment as to these causes of action turns on whether MAE may be held accountable for Damota's promises and representations to Linn.  Damota was not an MAE employee; rather, the record in the light most favorable to plaintiff shows that he was employed by AeroJet as a contract coordinator who was assigned to, and worked on-site at, MAE to procure contract labor for MAE projects.  "It is ... well settled that an agent with actual or apparent authority may enter into a contract and bind his or her principal."  *Cook's Pest Control, Inc. v. Rebar*, 852 So.2d 730, 738 (Ala. 2002). Likewise, a principal may be liable for the fraudulent promises or representations of its agent within the scope of such agent's authority.  *See generally Glass v. Southern Wrecker Sales*, 990 F. Supp. 1344, 1351-52 (M.D. Ala. 1998).  There is no evidence that MAE expressly or impliedly authorized Damota to make promises on its behalf concerning the particular assignments that a contract mechanic would or would not be given at MAE; to the contrary, there is voluminous, unrebutted evidence running directly contrary to such a proposition.

---

[26]    *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 746 (11th Cir. 2006) (explaining that policy of supplemental jurisdiction "is to support the conservation of judicial energy and avoid multiplicity in litigation," and it is appropriate to exercise jurisdiction where substantial judicial resources have already been committed, such that sending case to another court will cause substantial duplication of effort); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (although district court may decline supplemental jurisdiction under § 1367(c)(3) after dismissing all federal claims, "the court may continue to exercise supplemental jurisdiction even after the federal claims are dismissed").

Therefore, the question of Damota's authority reduces to whether he had apparent authority to bind MAE and to make representations on its behalf concerning the job assignments that Linn would receive.

Under Alabama law, "[t]he doctrine of apparent authority is based on the principal's holding the agent out to a third person as having the authority under which he acts, and the doctrine can be invoked by one who has been misled to his detriment." *Rosser v. AAMCO Transmissions, Inc.*, 923 So.2d 294, 301 (Ala. 2005) (citations and internal quotations omitted). The critical point is that "[a]n agent's apparent authority must be founded upon the conduct of the principal and not upon the conduct of the agent." *Alexander v. Burch*, 968 So.2d 992, 996-97 (Ala. 2006) (citation omitted); *see also Kennedy v. Western Sizzlin Corp.*, 857 So.2d 71, 77 (Ala. 2003) ("Apparent authority is inferred from the conduct of the principal."). Apparent authority may be conferred by both acts and omissions of the principal, and apparent authority may be found to exist "where the principal passively permits the agent to appear to a third party to have the authority to act on his behalf." *Cook's Pest Control*, 852 So.2d at 738. The Eleventh Circuit has succinctly summarized the Alabama test for apparent authority as follows: "Apparent authority is based on the principal holding the agent out to the third party as having the authority upon which he acts, not upon what one thinks an agent's authority might be, or what the agent holds out his authority to be." *General American Life Ins. Co. v. AmSouth Bank*, 100 F.3d 893, 898 (11th Cir. 1996) (applying Alabama law); *see also Glass*, 990 F. Supp. at 1353 ("Representations of the agent cannot be the basis for a finding of apparent authority.") (citation omitted).

The Alabama Supreme Court has opined that "a summary judgment on the issue of agency is generally inappropriate because agency is a question of fact to be determined by the trier of fact," but that the party asserting it still "has the burden of adducing substantial evidence to prove its existence." *Kennedy*, 857 So.2d at 77 (citation omitted); *see also Glass*, 990 F. Supp. at 1351 (recognizing that, while agency questions are generally determined by the finder of fact, a plaintiff must still come forward with evidence from which a reasonable jury could find an agency relationship). Linn has not done that here. He does not identify anything that MAE did or omitted to do that would confer apparent authority on Damota to promise particular job assignments to Linn. He does not identify a single instance in which MAE had ever suffered

-18-

Damota to make promises to prospective contract employees about their job assignments, or acquiesced in his having done so.  He does not show any facts suggesting that MAE ever held Damota out to Linn or any other prospective employee as having the authority to guarantee particular job assignments.  In short, plaintiff comes forward with no evidence that MAE had ever held out Damota as having authority to do anything other than arrange for contract employees to go to work at MAE, with the details of those arrangements being left to MAE's discretion.  To be sure, Linn testified, "I guess, yes" when asked whether he believed Damota had authority to promise him a particular MAE job assignment.  (Linn Dep., at 163.)  Linn also testified "I think he already discuss with the other people, the people at MAE, you know, for me to go there."  (*Id.* at 164.)  For apparent authority purposes, however, it does not matter what Linn believed.[27]  Plaintiff points to no evidence and makes no argument that MAE did or failed to do anything that conveyed that impression to him.  The mere fact that Damota may have suggested or insinuated to Linn that he was empowered to make particular MAE job assignments is not sufficient to hold MAE liable for those representations under an "apparent authority" theory, barring some culpable act or omission by MAE.[28]

Plaintiff's situation is not unsympathetic.  Taking plaintiff's evidence as true, Damota either lied to him or made a promise to him that MAE refused to honor.  Linn relied on this promise to his detriment by leaving his employment in Dothan without notice and going to work

---

[27]     This principle is also fatal to plaintiff's reliance on Bryant's deposition testimony for the proposition that a prospective employee might reasonably assume that a corporate recruiter possesses authority to make representations concerning the contours and details of a job being pitched by such recruiter.  Again, apparent authority hinges on the conduct of the principal, not the reasonable assumptions of the prospective employee.

[28]     In an attempt to bolster his "apparent authority" argument, plaintiff falls back on factual representations that are untethered from any facts of record.  Plaintiff asserts, "In order to get manpower and not merely paper to MAE, Mr. Damota was empowered to make and made promises on behalf of MAE - promises which it was bound to keep."  (Plaintiff's Brief (doc. 37), at 26.)  This statement was apparently drawn from thin air.  The Court is aware of nothing in the record, and certainly plaintiff has cited nothing, tending to raise an inference that Damota was empowered to make promises on behalf of MAE concerning job assignments and other terms and conditions of work.  The record evidence before the Court is to the contrary, and plaintiff's exaggeration of the record does not redound to his benefit.

at a lower-paying job for MAE, only to have MAE assign him to a different job than the one he had been promised by Damota and fire him when he declined to accept it.  From Linn's standpoint, this sequence of events is certainly unfortunate.  Linn may well have believed that the reckless promises he accuses Damota of making were authorized by MAE.  But that doesn't mean it is MAE's fault or that MAE can be held accountable for Damota's representations under Alabama law.  The record is devoid of evidence from a which a reasonable factfinder could conclude that MAE had engaged in any act or omission that cloaked Damota with apparent authority to promise a particular job assignment or category of job assignments to Linn or any other prospective contract employee.  As such, MAE cannot be held liable for such promises by Damota, either on a breach of contract theory or on a promissory fraud theory.  Defendant is entitled to entry of summary judgment on both causes of action.

**V.      Conclusion.**

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 35) is **granted**.  Plaintiff's claims are **dismissed with prejudice**.  A separate judgment will enter.


DONE and ORDERED this 25th day of July, 2008.


s/ WILLIAM H. STEELE_____
UNITED STATES DISTRICT JUDGE